300 S.E.2d 607

The CHESAPEAKE AND POTOMAC
TELEPHONE COMPANY OF
WEST VIRGINIA

v.

PUBLIC SERVICE COMMISSION OF
WEST VIRGINIA.

No. 15424.

Supreme Court of Appeals of
West Virginia.

March 4, 1982.

Rehearing Denied May 27, 1982.

David B. Frost, Charleston, Michael J. Morrissey, Robert A. Levetown and William L. Leonard, Washington, D. C., for petitioner.

Joel B. Shifman, Daniel L. Frutchey and Marc E. Lewis, PSC, Charleston, for respondent.

Smith & Rowe and Robert J. Smith, Charleston, Adair & Goldthwaite and Thomas S. Adair, Atlanta, Ga., Norman M. Gleichman, Washington, D. C., for amicus curiae Communication Workers of America.

Hanna & Elliott and Homer W. Hanna, Jr., Charleston, for Members of W.Va. Tel. Answering Committee, et al.

McGRAW, Justice:

The Chesapeake and Potomac Telephone Company of West Virginia (C&P) appeals from an order issued by the Public Service Commission of West Virginia (Commission) on July 2, 1981 that denied C&P's petition for reconsideration and affirmed a final order issued by the Commission on March 4, 1981. C&P contends the order issued by the Commission on July 2, 1981 is arbitrary, capricious, contrary to the evidence and the product of the misapplication of legal principles. It therefore requests that the Commission's order be set aside, and

that the case be remanded for further proceedings as may be just and proper. We find merit in some of the arguments of the appellant and grant the requested relief in part.

This case arises from an application filed by C&P with the Public Service Commission on May 5, 1980, which set forth proposed increased rates and charges for telephone service in the amount of 46.8 million dollars, to become effective June 4, 1980. By order entered June 2, 1980 the Commission suspended the proposed rates and charges until October 2, 1980 so that hearings could be held on the issues raised by the application.

Public hearings were subsequently held and on October 2, 1980 the Commission issued an interim order which rejected part of the proposed increase, but permitted the balance to become effective under bond and subject to refund, pending determination of the remaining issues. The interim order authorized C&P to increase its rates by 38.8 million dollars, a figure representing a 10.25 percent rate of return, the rate of return the Commission found to be just and reasonable from the evidence produced at the hearings.

On December 17 and 18, 1980, hearings were held in the final phase of the case. On March 4, 1981 the Commission issued its final order establishing C&P's final rates for the future and directing C&P to make refunds, including interest, on charges collected in excess of the authorized rates. Part of the refund order was attributable to the Commission's decision to disallow, for rate making purposes, expenditures representing a profit of more than 10.25 percent on equipment which C&P had purchased over a twenty year period from its affiliate Western Electric Company (Western Electric). Another portion of the refund was attributable to the Commission's decision to disallow, for rate making purposes, the cost to C&P of providing its employees telephone service free of charge or at reduced rates.

On March 16, 1981 C&P filed a petition for reconsideration of the March 4, 1981 final order, alleging that the Commission's decision to disallow, retroactively, profits above a 10.25 percent rate of return earned by Western Electric on equipment sales to C&P was arbitrary and capricious in that the final order set forth no explanation for the departure by the Commission of its long-standing approval of the full profit earned by Western Electric on such sales, and that the Commission's decision to disallow the cost to C&P of providing its employees telephone service at a reduced rate was also an unexplained departure of its long-standing approval of the inclusion of the cost of this service for rate making purposes.

By order issued July 2, 1981 the Commission found that C&P had presented no new arguments warranting a reversal of the decision on Western Electric profits and employee telephone service, and therefore affirmed the final order of March 4, 1981. C&P appeals from that decision.

### I. STANDARD OF REVIEW

In the recent case of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), we discussed at some length the standard of review this Court will apply on appeal of an order of the Public Service Commission. In syllabus point two of that opinion we adopted the comprehensive standard of review established by the United States Supreme Court in *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Syllabus point two of *Monongahela Power Co. v. Public Service Commission, supra*, provides:

In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial

498

integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

As explained in *Monongahela Power Co. v. Public Service Commission, supra,* this standard of review establishes a three-pronged analysis which focuses on (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper. 166 W.Va. at 429, 276 S.E.2d at 183.

Initially we note that C&P does not here contend that the Commission has abused or exceeded its authority in the sense that its order exceeds the broad regulatory duties entrusted to the Commission. Neither does C&P argue that as a result of the Commission's actions it cannot maintain its financial integrity, attract necessary capital, nor fairly compensate investors for the risks they have assumed. Indeed, as was the case in *Virginia Electric and Power Co. v. Public Service Commission,* 161 W.Va. 423, 242 S.E.2d 698 (1978), there is no indication on the record before this Court "that the utility is not making money, is not able to attract investors, or is not providing the service it should...." *Id.,* 161 W.Va. at 433, 242 S.E.2d at 704. Therefore our inquiry in this case will focus on the second step of the *Permian Basin* analysis which requires an examination of the Commission's methodology and a determination of whether there is adequate evidence to support the Commission's findings.

The *Permian Basin* standard of review adopted in *Monongahela Power Co. v. Public Service Commission, supra,* did not supplant, but rather incorporated, the previous standards enunciated by this Court regarding the sufficiency of the

Commission's findings and the methods of regulation it employs. 166 W.Va. at 428, 429, 276 S.E.2d at 183. We have previously held, in deference to the Commission's expertise, that this Court will not substitute our judgment for that of the Commission on controverted evidence. *Charleston v. Public Service Commission,* 110 W.Va. 245, 159 S.E. 38 (1931); *Harrisville v. Public Service Commission,* 103 W.Va. 526, 138 S.E. 99 (1927). However, findings of fact made by the Commission will be overturned as clearly wrong when there is no substantial evidence to support them. *See Mountain Trucking Co. v. Public Service Commission,* 158 W.Va. 958, 216 S.E.2d 566 (1975); *Mountain Trucking Company v. Daniels,* 156 W.Va. 855, 197 S.E.2d 819 (1973).

This does not mean that this Court will not make a searching and careful inquiry into the facts, but only that we will not substitute our judgment for that of the Commission. *Charleston v. Public Service Commission, supra.* In order to facilitate this careful scrutiny of the facts we have stressed the need for adequate findings by the Commission. *Mountain Trucking Co. v. Public Service Commission, supra; Mountain Trucking Co. v. Daniels, supra.* This is especially important in cases involving complex economic or scientific data that a court cannot evaluate properly without expert knowledge in areas beyond the peculiar competence of courts. *See Citizens Bank v. West Virginia Board of Banking and Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977). Accordingly, we have in the past remanded orders of the Commission when those orders fail to specify the facts on which they are based, or fail to explain how a conclusion was reached on the facts presented. *See, e.g., Monongahela Power Co. v. Public Service Commission, supra.*

This Court has traditionally given the Commission great flexibility in its rate making methodology. In the syllabus of *Virginia Electric and Power Co. v. Public Service Commission, supra,* we held:

The Public Service Commission may employ such methods for determining utility rates as it deems suitable, so long

as the end result guarantees West Virginia consumers good service at fair rates and enables utilities to earn a competitive return for their stockholders upon their investment in West Virginia.

Our examination of the methods of regulation employed by the Commission is, therefore, not directed at whether the Commission has selected the best or most precise methods, but at whether the manner in which the methods are employed is justified by the record and results in an order which is fair to both the consumer and to the utility.

With the limits of our inquiry thus defined, we are now prepared to address the issues raised by the appellant.

## II. WESTERN ELECTRIC PROFITS

The appellant, C&P, is one of twenty-three Bell System operating companies which are subsidiaries of American Telephone and Telegraph Company (AT&T). C&P is wholly owned by AT&T. AT&T also owns Western Electric Company, which is the manufacturing, purchasing, and supply branch of the Bell System. Western Electric supplies approximately 85 percent of the Bell System companies' equipment needs.

■ All or a significant portion of the prices which C&P pays to Western Electric for equipment purchases is capitalized by C&P and made a part of its rate base. The price so capitalized includes the element of profit earned by Western Electric on its sales to C&P. Under the terms of W.Va. Code § 24-2-4a (1980 Replacement Vol.) a public utility seeking an increase in rates and charges has the burden of showing that the proposed increase is just and reasonable. *See Natural Gas Co. v. Public Service Commission*, 95 W.Va. 557, 121 S.E. 716 (1924). Thus at the hearings held before the Commission, C&P attempted to show that Western Electric prices, and the profits it earned on sales to Bell System companies, were reasonable, and therefore that the full profit earned by Western Electric on sales to C&P should be included in C&P's rate base.

Testimony presented by C&P indicated that Western Electric sets its prices based on a reasonable rate of return; that the overall prices charged to C&P by Western Electric are approximately 82 percent of the lowest price charged by general trade suppliers, resulting in a 55 million dollar savings to C&P; that since 1950 Western Electric's prices have increased only 49 percent, while manufacturers listed on the producer price index increased prices 268 percent in the same period; that C&P purchases the lowest priced product suitable to its needs; that Western Electric is subject to business risks as any other manufacturing company and thus should be entitled to earn a return similar to that earned by other manufacturing industries; and that the rate of return currently earned by Western Electric is in fact lower than the rate of return earned by 50 large manufacturers throughout the nation and by the industries listed in Standard & Poor's 400 Industrial Index.

Commission staff on the other hand argued that Western Electric was earning "excess profits" on its sales to C&P, and therefore C&P's rate base should be adjusted by reducing Western Electric's allowable return on investment, as reflected in C&P's rate base, to C&P's overall rate of return as authorized by the Commission.

In support of its argument that Western Electric was earning "excess profits" on its sales to C&P, staff presented testimony indicating that C&P's evidence comparing Western Electric prices with those of general trade suppliers was based on prices charged by Western Electric to all Bell System affiliates, rather than on prices charged to C&P; that C&P failed to indicate whether manufacturers of telecommunication equipment are included in the producer price index for durable manufacturers, and thus its comparison of price increases for Western Electric and other manufacturers was of questionable relevance; that Western Electric's prices are in fact higher than prices charged by general trade suppliers on many products; that because AT&T owns both Western Electric, the seller, and C&P, the buyer, the business risk to Western Electric is unique and

cannot be compared with other independent manufacturers; and that the normal "cost of service" approach used by the Commission to determine the reasonableness of Western Electric's profits is inappropriate because it fails to recognize that Western Electric contributes earnings to AT&T directly when it sells equipment to C&P, and indirectly when the cost of these investments are included in C&P's rate base.

After reviewing the evidence on these points the Commission found merit in the staff's position, and ruled that it would be unreasonable to allow AT&T to earn profits from Western Electric's sales to C&P in excess of the 10.25 percent rate of return authorized by the Commission to be borne by C&P's West Virginia ratepayers. This finding was made retroactive by reducing C&P's rate base by the amount of excess profits earned by Western Electric on sales of surviving telephone equipment dating back to 1959.

C&P contends the decision to disallow Western Electric's alleged "excess profits" is arbitrary because (A) it retroactively condemns as unreasonable the same transactions the Commission expressly found to be reasonable in three prior rate cases; (B) the disallowance is based on a theory of "double profit" that is factually incorrect; and, (C) the decision disavows the traditional legal standard for evaluating the reasonableness of C&P's purchases from its affiliate, and substitutes an arbitrary standard which the evidence contradicts, and imposes this arbitrary standard retroactively in a punitive fashion that no other jurisdiction, save one, has implemented.

### (A)

In three previous cases the Commission determined that Western Electric prices were reasonable and that purchases made by C&P from Western Electric were reasonable. *Re Chesapeake and Potomac Telephone Co. of West Virginia*, Case No. 79–162–T–42T, 40 PUR 4th 279, 284 (1980); *Re Chesapeake and Potomac Telephone Co. of West Virginia*, Case No. 9358 (W.Va. Pub. Ser. Comm'n Oct. 12, 1979); *Re Chesapeake and Potomac Telephone Co. of West Virginia*, Case No. 8890, 26 PUR 4th 29, 38 (1978). Moreover, the decision in Case No. 79–162–T–42T, *supra*, was based on much the same evidence as presented by C&P in the present case.

However, in both Case Nos. 8890 and 79–162–T–42T, the Commission noted that "the burden of proving the reasonableness of purchases from an affiliate supplier is on the company ..." and warned C&P that they should in future rate proceedings "provide substantial evidence with regard to the reasonableness of Western Electric's pricing policies, operating efficiencies, and rate of return relative to the system as a whole." 40 PUR 4th at 284; 26 PUR 4th at 38. Since, as C&P admits, the evidence presented by C&P at the hearing in this case was of much the same nature and type as presented in Case No. 79–162–T–42T, *supra*, it would appear that C&P failed to heed this warning, and consequently failed to carry its burden of proof.

█ Furthermore, it is generally recognized that the doctrine of *stare decisis* does not normally apply to administrative decisions. As Professor Davis states in his respected treatise:

When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of the past decisions .... Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act ....

2 K. Davis, *Administrative Law* § 18.09 (1958) (footnotes omitted.)

*Accord, State v. Alabama Public Service Commission*, 293 Ala. 553, 307 So.2d 521 (1975); *Rumney v. Public Utilities Commissioner*, 172 Colo. 314, 472 P.2d 149 (1970). The Commission's decisions in previous cases therefore do not preclude it from reaching an opposite result in this case.

Moreover, the Commission's order adequately explains the motivating circumstances for its decision as well as the evidence underlying those circumstances, and thus is consistent with the standard

adopted in *Citizens Bank v. West Virginia Board of Banking and Financial Institutions, supra,* requiring an adequate explanation of reasons for an agency conclusion which is predicated upon a change of agency policy from former practice. 160 W.Va. at 727, 233 S.E.2d at 727.

### (B)

In its order of March 4, 1981, the Commission stated: "Despite C&P's testimony as to the similarity of Western's business risk to those risks incurred by other manufacturing companies, we cannot ignore the fact that AT&T earns profit both directly on Western's sales to C&P and indirectly through inclusion of these profits in C&P's rate base and operating expenses." C&P contends, and it must be conceded, that this "double profit" theory is incorrect.

The error in the "double profit" theory can be simply illustrated. AT&T owns both C&P and Western Electric. Thus, although *Western Electric* earns a profit on equipment sold to C&P, that profit is not realized by *AT&T* because the money comes from the pocket of another AT&T company. Only when the price of the transaction is recognized by the Commission for rate making purposes does AT&T realize a profit on the transaction.

Although the "double profit" theory as applied to C&P's transactions with Western Electric is factually incorrect, that does not require reversal of the Commission's order. The Commission relied on many factors in addition to the "double profit" theory. These include the Commission's finding that C&P introduced no convincing evidence demonstrating the reasonableness of Western Electric's prices, and that the evidence presented by C&P regarding the reasonableness of Western Electric's profits was unpersuasive when considered in light of the unique nature of the business risk experienced by Western Electric as a result of its relationship with C&P and AT&T.

Indeed, the thrust of the Commission's decision does not focus on the "double profit" theory, but rather on the "excess profits" AT&T earns from sales by Western Electric to C&P. In the words of the Commission:

Our inquiry does not focus on determining a proper rate of return for Western. Rather our analysis focuses on the reasonableness of the amounts C&P seeks to recover from its West Virginia ratepayers for providing profits to AT&T on C&P's purchases from Western. * * * [W]e must not ignore our obligation to C&P's ratepayers to ensure that the profits earned by AT&T on C&P's West Virginia jurisdictional operations are reasonable. Western supplies 85 per cent of the Bell operating companies' telecommunication equipment needs. AT&T owns both C&P, the buyer, and Western, the seller. Because of the integrated structure of the Bell System, we find it unreasonable to allow AT&T to earn profits from C&P's West Virginia ratepayers in excess of the 10.25% rate of return authorized by this Commission for C&P.

Final Order March 4, 1981 at 6–7.

This approach has been adopted by Public Service Commissions in other jurisdictions, *see Re Pacific Telephone & Telegraph Co.,* 95 PUR 3d, 1, 15 (Cal.P.U.C.1972); *Re Southwestern Bell Telephone Co.,* 28 PUR 4th 519, 540 (Kansas Corp. Comm'n 1979); *Re New York Telephone,* 2 PUR 4th 1, 12 (N.Y.P.S.C.1973); *Re Pacific Northwest Bell Telephone Co.,* 100 PUR 3d 82, 87–89 (Oregon P.U.C. 1973), *affirmed sub nom. Pacific Northwest Bell Telephone Co. v. Sabin,* 21 Or.App. 200, 534 P.2d 984, 8 PUR 4th 159, *review denied* (1975), and was previously advanced by staff of the West Virginia Commission in three previous cases in which Western Electric profits were at issue. *See Re Chesapeake and Potomac Telephone Co. of West Virginia,* Case No. 79–162–T–42T, *supra; Re Chesapeake and Potomac Telephone Co. of West Virginia,* Case No. 9358, *supra; Re Chesapeake and Potomac Telephone Co. of West Virginia,* Case No. 8890, *supra.*

There is substantial evidence in the record which supports the Commission's findings regarding Western Electric profits apart from the "double profit" theory mentioned in the order, and thus the Commis-

sion's order will not be reversed on this ground.

(C)

The reasonableness of Western Electric's prices and profits is an issue which has been raised in numerous rate making proceedings before public utility commissions in many jurisdictions.[1] In virtually all of these cases the criteria employed to determine the reasonableness of Western Electric's prices and profits is that specified in *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), and *Illinois Bell Telephone Co. v. Gilbert*, 3 F.Supp. 595 (N.D.Ill.1933), *rev'd on other grounds sub nom. Lindheimer v. Illinois Telephone Co.*, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934). *See also City of Houston v. Southwestern Bell Telephone Co.*, 259 U.S. 318, 42 S.Ct. 486, 66 L.Ed. 961 (1922). The basic criteria involves an examination of Western Electric's prices to determine if they are lower than those charged by other manufacturers for comparable material, and an examination of Western Electric's profits to determine whether they are "lower than those of the other large manufacturing companies whose risks and hazards make them fairly comparable with Western." *Illinois Bell Telephone Co. v. Gilbert, supra*, 3 F.Supp. at 602.

Prior to this case, the reasonableness of Western Electric's prices and profits has been before the West Virginia Commission on three occasions. In the first of these cases, Commission staff urged that an adjustment be made to C&P's rate base to reflect the "excess profits" earned by Western Electric from 1956 through 1975 on sales of equipment to C&P. *Re Chesa-peake and Potomac Telephone Co.*, Case No. 8890, *supra* at 38. The Commission, however, found that the evidence produced by C&P, which tended to show that Western Electric's prices were as low as prices available from other suppliers and that its profits were reasonable when compared with other similar manufacturers, established the reasonableness of the prices charged by Western Electric, and rejected staff's proposed adjustment, although the Commission did note:

The Commission finds that the burden of proving the reasonableness of purchases from an affiliate supplier is on the company, and without being more specific as to the type of evidence which should be introduced to justify the pricing policies of Western Electric, recommends that in future rate proceedings, [C&P] provide substantial evidence with regard to the reasonableness of Western Electric's pricing policies, operating efficiencies, and rate of return relative to the system as a whole.

26 PUR 4th at 38.

Chairman McDonald dissented from the Commission's findings concerning the reasonableness of Western Electric's prices and profits, stating:

Even though the company has presented evidence that Western's prices are lower than those which would be charged to C&P by independent suppliers and that Western profits have been below those achieved by other industrial corporations, I am convinced that a meaningful comparison of Western Electric with other telecommunication equipment suppliers is impracticable. The characteris-

---

1. *See, e.g., Mountain State Telephone & Telegraph*, 7 PUR 3d 115, 118 (Ariz.Corp. Comm'n 1954); *Mountain State Telephone & Telegraph*, 11 PUR 4th 1, 8 (Colo.P.U.C. 1975); *Chesapeake and Potomac Telephone Co.*, 15 PUR 4th 302, 339 (D.C.P.S.C.1976); *Southern Bell Telephone & Telegraph Co.*, 66 PUR 3d 1, 41 (Fla.P.S.C.1966); *Illinois Bell Telephone Co.*, 13 PUR 4th 482, 503–04 (Ill. Commerce Comm'n 1976); *Chesapeake and Potomac Telephone Co. of Maryland*, 81 PUR 3d 342, 353 (Md.P.S.C. 1969); *Northwestern Bell Telephone Co.*, 37 PUR 4th, 1, 18 (Minn.P.S.C.1980); *Southwestern Bell Telephone Co.*, 96 PUR 3d 148, 152 (Mo.P.S.C. 1972); *Mountain States Telephone & Telegraph Co.*, 1 PUR 3d 215, 220 (Mont.P.S.C.1953); *Northwestern Bell Telephone Co.*, 5 PUR 3d 24, 29–30 (Neb.Ry.Comm'n 1954); *Northwestern Bell Telephone Co.*, 21 PUR 4th 224, 227 (N.D.P. S.C.1977); *Ohio Bell Telephone Co.*, 41 PUR 4th 157, 169 (Ohio P.U.C. 1980); *Bell Telephone Co. of Pennsylvania*, 2 PUR 4th 417, 427–28 (Pa.P.U. C.1973); *Southwestern Bell Telephone Co.*, 34 PUR 4th 224, 230 (Tex.P.U.C.1979); *New England Telephone & Telegraph Co.*, 13 PUR 4th 268, 271 (Vt.Pub.Ser.Bd.1976); *Chesapeake and Potomac Telephone Co. of Virginia*, 19 PUR 4th 349, 357 (Va.S.C.C.1977).

tics of Western, including its virtually unrestricted marketplace, advantages in volume, design integration, and intercorporate business opportunities, places it in a unique position, not comparable to its competitive counterparts.

Likewise, the company's argument that Western has greater business risks and "volatility of earnings" than C&P and thus should not be held to C&P's overall return on investment, is unpersuasive. Western Electric literally monopolizes the market for equipment used by Bell System operating companies. Such a market dominance demonstrates an economic risk no greater than that of the Bell operating companies themselves.

Nor can there be a valid comparison of Western's prices and earnings with those of other telecommunications equipment suppliers. The companies used in these comparisons face competitive pressures and general business problems not applicable to Western.

For the above reasons, I would reduce C&P's rate base by the amount of excessive profits earned by Western Electric on sales of surviving telephone equipment to C&P and, accordingly, reduce the level of depreciation charges on such disallowed plant investment.
26 PUR 4th at 43–44.

In the next case involving the reasonableness of Western Electric's prices and profits, Commission staff again urged that C&P's rate base be adjusted to exclude Western Electric's "excess profits." However, again relying on C&P's evidence that Western Electric's prices were lower than other manufacturers of telecommunications equipment, and that its business risk justified a higher rate of return, the Commission found that "[t]he prices charged by Western Electric have not been shown to be unreasonable and therefore purchases made by C&P from Western Electric should not be adjusted." *Re Chesapeake and Potomac Telephone Co.*, Case No. 9358, *supra* at 14.

Finally in Case No. 79–162–T–42T, the Commission again considered C&P's evidence that Western Electric's prices were lower than those charged by other manufacturers for comparable products, and that its profits were lower than other large manufacturing companies with comparable risks, and rejected staff's proposed "excess profits" adjustment, finding "that for the purposes of this case it has been established that Western Electric prices are reasonable and that purchases made by [C&P] from Western during the test year were reasonable." *Re Chesapeake and Potomac Telephone Co.*, Case No. 79–162–T–42, *supra* at 284. However, as in the first case involving Western Electric prices and profits, the Commission gave the following caveat: "Since the burden of proving the reasonableness of purchases from an affiliate supplier is on the company, [C&P] should in future rate proceedings provide substantial evidence regarding the reasonableness of Western's pricing policies, operating efficiencies, and rate of return relative to the system as a whole." *Id.*

In the case *sub judice* C&P contends that the Commission has abandoned the "prices and profits" test it employed in the three previous rate cases, and deemed that the purchases by C&P from Western Electric are *per se* unreasonable to the extent they exceed C&P's authorized rate of return. C&P contends this is an inappropriate standard for determining the reasonableness of transactions between Western Electric and Bell System operating companies, and conflicts with the criteria established by the United States Supreme Court in *Smith v. Illinois Bell Telephone Co.*, *supra.*

We find no merit in these contentions. In *Smith v. Illinois Bell Co.*, *supra*, the Illinois Commerce Commission found that the prices charged by Western Electric to the telephone company were excessive and should not be credited in full. Because of its finding on this and other issues, the commission lowered the rates of the telephone company. The company appealed the commission's order alleging that the approved rates were confiscatory. The district court found that the contention that Western Electric prices were exorbitant was not supported by the record, and found

that the profit earned by Western Electric on its total business had not been excessive. On appeal the United States Supreme Court stated:

> That fact has evidentiary value but the finding does not go far enough. The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjectured that the net earnings on the entire business represent the net earnings from the sales to the Bell licensees generally or from those to the Illinois Company. Nor is the argument of the appellants answered by a mere comparison of the prices charged by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point.

282 U.S. at 152–153, 51 S.Ct. at 70.

In *Illinois Bell Telephone Co. v. Gilbert, supra,* the district court, after quoting the above language from *Smith,* found that the prices charged by Western Electric were fair and reasonable, and that its profits were not excessive. In reaching these conclusions the court examined the relationship between Western Electric and the Bell System operating companies:

> The Western Electric Company, because of its relationship with the Bell system, has no sales expense and no credit risk involved in its Bell business. By receiving advance estimates from the Bell associate companies of their requirements, it is able to plan its manufacturing work more efficiently and economically. These factors result in reducing Western's costs, but they are not advantages retained by Western, since such reductions in costs are passed on by it in prices charged to its Bell customers. As a result of this relationship, Western has been enabled to sell, and has sold, its manufactured articles to its Bell customers at lower prices than otherwise would have been possible.
>
> * * * Western's rate of earnings on its investment in its Bell business and on its investment, less the amount of its depreciation reserve account, has been substantially one-third lower than those of other large manufacturing companies whose risks and hazards make them fairly comparable with Western. Its rate of profit on sales in its Bell business, as distinguished from earnings on investment, has been less than one-half of the rate of profit made on sales by other large, comparable manufacturing industries.

3 F.Supp. at 602–03.

In *Houston v. Southwestern Telephone Co., supra,* a city ordinance fixing local telephone rates disallowed certain amounts paid by the telephone company to Western Electric for equipment purchases. The telephone company alleged that the rates fixed by the statute were confiscatory. The district court agreed, and the city appealed. The city contended that the disallowance should be upheld because of the special relationship between AT&T, Western Electric, and the telephone company, and because no disclosure of the profits earned by Western Electric had been made. The telephone company had introduced evidence tending to show that the prices charged by Western Electric were reasonable and less than those of other manufacturers. Upon this evidence the Supreme Court stated:

> [the] fact that the American Telephone & Telegraph Company controlled the Company and the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the

community served by the Company, but the court recognized and applied this rule. Here again, the evidence introduced by the City was meager and indefinite, while that of the Company was exceptionally full and complete and both contentions must be denied.

259 U.S. at 323, 42 S.Ct. at 488.

■ While these cases focus their inquiry on the fairness or reasonableness of the prices charged and profit earned by Western Electric, it is not evident that they establish a hard and fast "prices and profits" test, as C&P alleges. A comparison of the prices charged and profit earned by Western Electric with other comparable manufacturers may be a valid method of determining reasonableness, but the cases do not indicate it is the required method. Where an agency has been granted broad regulatory authority, it is not obligated to employ any single formula or combination of formulas to determine what in each case are just and reasonable rates. However, we need not belabor this point because the standard of review employed by the Commission in this case is entirely consistent with the "prices and profits" criteria.

In this case C&P introduced evidence tending to show that the prices charged by Western Electric were lower than those charged by other suppliers, and that its rate of return was lower than other manufacturers. However, the Commission staff introduced evidence showing that Western Electric's prices were in fact higher for many items, that its price comparison figures were of questionable relevance in that the comparison was based on transactions between Western Electric and all Bell System telephone companies, rather than being focused on C&P, and that its rate of return comparison did not specify whether telecommunication manufacturers were included. Based on this evidence, and in light of its previous warnings, the Commission found that C&P had not met its burden of proving reasonableness, and that because of the special relationship existing between AT&T, Western Electric and C&P, the company could not include in its rate base profits to AT&T attributable to purchases from Western Electric, to the extent they exceed C&P's authorized rate of return.

Inasmuch as C&P was given an opportunity to present evidence on the reasonableness of Western Electric's prices and profits, and inasmuch as the Commission fully considered the evidence presented, no different standard of review was employed in this case than in previous cases. The Commission simply found that C&P had not borne its burden of proof on this issue, and accepted the staff's position that close scrutiny should be given to the special relationship between AT&T, Western Electric and C&P.

■ The approach adopted by the Commission is substantially in accord with that adopted in other jurisdictions that have held that where the evidence discloses that a utility has purchased the bulk of its equipment from an affiliated manufacturer, and that as a result of the affiliation the manufacturer enjoys a unique position of market power which renders a comparison of its prices and profits with those of general trade manufacturers inadequate as a measure of the reasonableness of its charges, the failure by the utility to provide additional evidence of reasonableness may be relied upon by the Public Service Commission as a basis for disallowing from the utility's rate base those portions of the charges which represent a return to the affiliated manufacturer greater than that allowed the utility itself. *Pacific Northwest Bell Telephone Co. v. Sabin*, 21 Or. App. 200, 534 P.2d 984, *review denied* (1975). *See also City of Los Angeles v. California Public Utilities Commission*, 7 Cal.3d 33, 102 Cal.Rptr. 313, 497 P.2d 785 (1972); *Re New York Telphone Co.*, 2 PUR 4th 1 (N.Y.P.S.C.1973); *Re Michigan Bell Telephone Co.*, 32 PUR 3d 395 (Mich.P.S.C. 1960); *Re Southwestern Bell Telephone Co.*, 34 PUR 3d 257 (Kan.Corp.Comm'n 1960).

■ However, we must agree with C&P that that portion of the Commission's order which makes the disallowance retroactive cannot be sustained. It is well established that the exercise by the Commis-

sion of its rate making authority is primarily a legislative function, *see, e.g., Randall Gas Co. v. Star Glass Co.*, 78 W.Va. 252, 88 S.E. 840 (1916); *State ex rel. Public Service Commission v. Baltimore and Ohio R.R.*, 76 W.Va. 399, 85 S.E. 714 (1915), and that by its nature legislative action operates prospectively and not retroactively. This concept is inherent in our statute establishing the general power of the Commission to "fix reasonable rates ... to be followed in the future." W.Va. Code § 24–2–3 (1980 Replacement Vol.); *see* Syllabus Point 3, *Virginia Electric and Power Co. v. Public Service Commission*, 162 W.Va. 202, 248 S.E.2d 322 (1978). Generally, retroactive rate making occurs when a utility is permitted to recover an additional charge for past losses, or when a utility is required to refund revenues collected, pursuant to then lawfully established rates. *See State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 585 S.W.2d 41 (Mo.1979); *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 451, 232 S.E.2d 184 (1977).

Technically, the disallowance ordered by the Commission is not retroactive rate making because the order requires the utility only to refund portions of revenues collected since October 2, 1980. However, insofar as the refunds include "excess profits" earned by Western Electric from 1959 onward, a period for which the Commission has thrice determined the prices and profits of Western Electric to be reasonable, the order contains an element of retroactivity which cannot equitably be sustained. In those jurisdictions where Western Electric excess profits have been disallowed, only one commission has disallowed such profits retroactively. *See Pacific Northwest Bell Telephone Company v. Sabin, supra; contra, City of Los Angeles v. California Public Utilities Commission, supra; Re New York Telephone Co., supra; Re Michigan Bell Telephone Co., supra; Re Southwestern Bell Telephone Co., supra.* We conclude that the Commission's order affecting Western Electric profits must be applied in a prospective manner.

In summary, there is substantial evidence on the record supporting the Commission's finding that an adjustment should be made to C&P's rate base disallowing excess profits earned by Western Electric on sales to C&P, and therefore its finding will not be disturbed. However, that portion of the Commission's finding which disallows such excess profits retroactively for periods which had previously been approved, constitutes a misapplication of legal principles, and cannot be sustained. The adjustment to the rate base should be made prospectively.

### III. EMPLOYEE TELEPHONE SERVICE

C&P grants its employees a discount telephone service through which non-management employees receive a 50 percent discount on local residential service and equipment. In addition, management, 30-year employees, and pensioners receive free local service and a reasonable amount of free toll calls. The cost of providing these benefits was disallowed by the Commission in its final order of March 4, 1981. The Commission found that it was "unreasonable to force C&P's rate payers to pay the telephone bills of C&P employees. The cost of this benefit is one more appropriately borne by C&P shareholders." Final Order, March 4, 1981 at 19.

The standard applied by the Commission to determine whether the provision of concession service imposed an unreasonable burden upon C&P's ratepayers was established in *Bluefield Gas Co.*, Case No. 9460 (W.Va.Pub.Ser.Comm'n September 7, 1979). In the *Bluefield* case the Commission held that such discounts are reasonable and not discriminatory "when there is a showing that the disallowance of such rates would not decrease the company's expenses, but rather would simply reappear in the form of higher wages or other benefits necessary to hire and retain employees." *Bluefield Gas Co., supra* at 2.

At the hearing on this issue C&P presented testimony indicating that if the Commission disallowed the employee concession service, C&P would have to provide

a cash payment to its employees in lieu of the service. Further testimony indicated that the benefit provided non-management employees is viewed as a condition of employment and as such is part of the collective bargaining agreement between C&P and the Communications Workers of America (CWA), although it was admitted that concession service was not specifically referred to in the agreement between C&P and the CWA.

Commission staff contended that this testimony did not demonstrate that C&P would have to pay higher wages if concession service were eliminated and thus did not meet the *Bluefield* standard. The Commission agreed, stating in its final order: "Other than the conclusory statements presented by C&P's witness, we find no evidence in this record convincing us that failure to provide concession service would lead to increased wage demands by C&P's employees." Final Order, March 4, 1981 at 19.

In its petition for reconsideration C&P tendered the affidavit of William J. Lane in an attempt to provide the evidence the Commission found lacking in the record. The affidavit of Mr. Lane stated:

I presently am, and have been for the past two years, President of Local 2001, Communications Workers of America, bargaining agent for nonmanagement employees of The Chesapeake and Potomac Telephone Company of West Virginia.

The concession telephone service which C&P has furnished its employees for more than a half century is regarded by the CWA's more than 4,000 members and, I am advised by union counsel, is, as a matter of law, a term and condition of employment at C&P within applicable Federal labor law.

The concession telephone service which C&P furnishes its employees is a non-wage benefit comparable to other fringe benefits provided by C&P and is, accordingly, an integral part of the total compensation paid by C&P to its employees.

The loss of concession service would thus amount to an actual reduction in total compensation paid and would, consequently, cause a demand to be made at the bargaining table for an increase in wages which would be, on a net, take-home basis (after taxes), roughly equivalent to the value of the concession service.

The Commission rejected the evidence presented in the affidavit as "too speculative to be taken into consideration" for rate making purposes. In explanation of its decision the Commission stated:

We based our March 4 decision on this issue on our belief that concession service for C&P's employees is sufficiently similar to telephone service provided other customers so as to invoke the legal prohibiition. [*sic*] against rate discrimination found in West Virginia Code, Section 24-3-2. While the issue is one of judgment and one on which commissions in other states differ, we believe that concession service, even though it has been provided for a long-period of time, cannot withstand legal scrutiny (at least for ratemaking purposes) because the service is not a bargained for benefit and is not part of the union/management labor agreement. (Footnotes omitted.)
Order, July 2, 1981 at 5.

C&P contends its employee telephone service is not discriminatory within the meaning of W.Va.Code § 24-3-2, that the decision of the Commission is contrary to the evidence, and that the Commission's decision misinterprets the nature of collective bargaining agreements. We agree.

In *Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 281 S.E.2d 238 (1981), we recognized that fringe benefits are part and parcel of the compensation an employee receives for his services. We stated in *Farley*:

[Fringe] benefits are not gratuities which employers benevolently bestow upon their employees. Rather they are integral components of a compensation package bargained for and agreed upon by the parties. One expects that both employers and employees strive for a fair exchange in the employment market place. A factor the employee undoubtedly considers when gauging the fairness

of an employment offer is the value of benefits the employer offers in addition to take home pay. Conversely, the employer also takes into account the cost of fringe benefits when determining the salary or hourly wage rate it will offer its prospective employees. Obviously if fringe benefits ... were absent from the compensation package, wages would be higher.

167 W.Va. at 635, 281 S.E.2d at 242.

C&P has provided concession telephone service to its employees for more than fifty years. It is obviously a factor which C&P employees consider when gauging the fairness of C&P's compensation proposals. To hold that the service is not contemplated as a part of the employment agreement between C&P and its employees is simply unrealistic, and misapprehends the nature of collective bargaining agreements. Such agreements cannot, in all instances, be limited to their written terms. In the words of one observor: "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages." Cox, *Reflections Upon Labor Arbitration,* 72 Harv.L.Rev. 1482, 1498 (1959). This principle was recognized by the United States Supreme Court in *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), wherein the Court cited with approval the above language and held that "the practices of the industry and the shop [are] equally a part of the collective bargaining agreement although not expressed in it." 363 U.S. at 582, 80 S.Ct. at 1352.

▮ We therefore hold that the provision of free or discount telephone service by a utility to its employees, which practice has been ongoing for a substantial period of time, and which the evidence shows is considered by both management and employee representatives as a concession in lieu of compensation, should be considered by the Public Service Commission in a rate making proceeding as part of the employment agreement.

▮ In this case the undisputed evidence before the Commission indicated that the concession service C&P provides its employees is a part of the employment agreement, and that if the service were withdrawn, a corresponding increase in wages would be demanded. The evidence also indicates that the service is supervised in such a manner to prevent abuse by C&P employees. This evidence is sufficient to meet the reasonableness standard established by the Commission in *Bluefield Gas Co., supra.* The Commission's finding to the contrary is not supported by the record evidence, and therefore must be reversed.

▮ Furthermore, because the concession service is a term and condition of employment with C&P, it is not prohibited by W.Va. Code § 24-3-2 (1980 Replacement Vol.), which provides:

No public utility subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person, firm or corporation, a greater or less compensation, for any service rendered or to be rendered, than it charges, demands, collects, or receives from any other person, firm or corporation for doing a like and contemporaneous service under the same or substantially similar circumstances and conditions.

It shall be unlawful for any public utility subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular character or traffic or service, in any respect whatsoever, or to subject any particular person, firm, corporation, company or locality, or any particular character of traffic or service, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

This section has no application to a proceeding when the service provided is not

rendered under "the same or substantially similar circumstances and conditions" rendered other customers. *Hooverson Heights Public Service District v. Public Service Commission*, 165 W.Va. 275, 270 S.E.2d 442 (1980). The service C&P provides its employees is a term and condition of employment with C&P, and thus the circumstances and conditions under which the service is rendered are entirely dissimilar than the circumstances and conditions under which telephone service is rendered to regular C&P customers.[2]

That the Legislature did not intend to prohibit employee discounts under W.Va. Code § 24–3–2 is evidenced by the language of W.Va.Code § 24–3–4 (1980 Replacement Vol.), which provides, in pertinent part: "Nothing in this Chapter shall be construed ... to prevent telephone ... companies from exchanging with one another and with common carriers the privileges of passes or franks for the officers, agents, employees, and their families of such companies and common carriers." This section clearly contemplates that granting service on special terms to a utility's employees is permissible. Otherwise the permission given to utilities to agree to honor the privileges of passes or franks given employees of other utilities would be illogical.

The West Virginia Commission expressed this view in a 1960 case involving C&P. In that case the Commission read the two statutes in *pari materia* and concluded that the concession service was not discriminatory. The Commission stated:

> We do not believe it was the intention of the legislature that a telephone utility and other utilities could enter into contracts with one another and with common carriers for the exchange of service for the officers, agents, employees and their families of such companies, without extending the same contractual privileges to such utilities regarding their own employees.

*Re Chesapeake and Potomac Telephone Co. of West Virginia*, Case No. 5103, 36 PUR 3d 417, 425 (1960).

We agree with this reasoning and therefore conclude that concession telephone service provided by a utility to its employees as a term and condition of employment is not discriminatory within the provisions of W.Va.Code § 24–3–2. The Commission's decision to the contrary misinterprets the scope of the statute and therefore must be reversed.

For the foregoing reasons the order of the Public Service Commission issued on July 2, 1981 that affirmed the final order of March 4, 1981 is reversed in part and the case is remanded for the entry of an order consistent with this opinion.

Reversed in part; remanded.

---

**2.** Our conclusion is supported by the Commission's final order of March 4, 1981, which did not prohibit concession service, but only disallowed it for rate making purposes. If the service were indeed discriminatory, the Commission's duty would be to prohibit the practice altogether. *See* W.Va. Code § 24–3–2.