438 S.E.2d 782

**HARRISON RURAL ELECTRIFICATION ASSOCIATION, INC., Complainant Below, Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Monongahela Power Company, Defendant Below, Appellees.**

No. 21812.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Dec. 9, 1993.

Delby B. Pool, Clarksburg, WV, for appellant.

Caryn Watson Short, Charleston, WV, for Public Service Com'n.

James T. Boggs, Arthur J. Chmiel, Fairmont, WV, for Monongahela Power Co.

PER CURIAM:

Harrison Rural Electrification Association, Inc. (HREA) appeals an order (2–1 Commissioner Frum dissenting) of the West Virginia Public Service Commission (PSC) resolving two customer service disputes between HREA and Monongahela Power Company (MPC) in favor of MPC. On appeal, HREA argues that the PSC should have found that the new customers were part of HREA's exclusive service territory based on a 1938 agreement of the parties and should not have classified the disputed areas as overlapping, that is an area outside an exclusive franchised area with intermeshed service provided by two or more utility companies. Because the record indicates that the PSC's decisions were supported by substantial evidence, we affirm the final order of the PSC.

I

The dispute concerns electrical service for customers in two areas in Harrison County, West Virginia, namely, the "Big Elm School," a new school located at the intersection of Tetrick Road and U.S. Rt. 19, and the "Auburn Woods Subdivision," a new subdivision located between Route 77/3 and Beard's Run Road (Route 17). Both HREA, a non-profit, privately-owned electric cooperative that buys electricity and distributes it to its members, and MPC, a public electric utility that also sells and distributes electricity to HREA, seek to provide electrical service in both areas.[1] The disputes were first heard by an administrative law judge (ALJ) who recommended that the disputes be resolved in favor of HREA based on an order in the PSC case of *Harrison Rural Electrification Association, Inc. v. Monongahela West Penn Public Service Co.*, No. 2570 (W.Va.P.S.C., Filed August 18, 1938) (hereinafter *HREA 1938*)[2] and the case's territorial map. The PSC refused to adopt the ALJ's recommended decision, finding *HREA 1938* and its map of limited value for resolving the disputes. Instead, the PSC found that because neither customer site was part of a utility's exclusive franchised area and because both utilities had served customers on the properties, the territories were considered "grey and overlapping" under the PSC's case of *Lumberport–Shinnston Gas Co. v. Equitable Gas Co.*, No. 86–749–CN–C (W.Va.P.S.C., Filed Sept. 29, 1987). Because the disputed territories were overlapping, the PSC resolved the disputes by following both customers' expressed preferences for service from MPC.

HREA appealed to this Court arguing that the PSC should not have reversed the ALJ's decision finding the disputed territories are part of HREA's exclusive territory, as shown by *HREA 1938*'s map. Although both the PSC and MPC acknowledge the existence of *HREA 1938*'s map, both the PSC and MPC argue that *HREA 1938*'s map is of limited

---

1. HREA's appeal is limited to PSC Nos. 92–0319–E–C, and 92–0687–E–C involving the territories of "Big Elm School" and "Auburn Woods Subdivision," respectively. HREA does not appeal the PSC's decision finding that the "AAA office," PSC No. 92–0640–E–C, is to be served by HREA.

2. Monongahela West Penn Public Service Company was the predecessor in interest for MPC.

value because it; (1) lacks a scale; (2) marks only certain towns and municipalities and not highways, rivers or other geographical features; (3) has not been updated as additional electrical facilities were constructed; and (4) has not been used as a base for PSC decisions for at least 15 years.[3] Both the PSC and MPC maintain that the PSC properly found the customers to be outside exclusive franchised areas and in areas with intermeshed service, which, following PSC case law, allows the customers' service preferences to determine the utility company.

### A. *Big Elm School*

The Harrison County Board of Education requested MPC to provide electrical service for its new school located between Tetrick Road, which is primarily served by HREA, and U.S. Rt. 19, which is primarily served by MPC. The ALJ noted that HREA was providing service to an oil well, which although located on the site was not owned by the Board of Education, and that HREA's lines along Tetrick Road were about 160 feet from the school. HREA also had three-phase service available and its lines crossed MPC's lines. The ALJ found that although MPC had no distribution lines on site, MPC may, at an earlier date, have served customers on site. To meet the school's needs, MPC had to upgrade its service line, which is about 300 feet from the school. Based on *HREA 1938's* map, the ALJ concluded that the "Big Elm School" was part of HREA's exclusive territory and recommended that HREA provide service.

The PSC found that although HREA had been providing service to an oil well owned by Interstate Oil and Gas on the site for two years, MPC had had two poles on the site for more than 40 years and had served customers on the site since before 1953. MPC alleges that their lines were removed to allow for construction and that the lines' removal did not show that MPC had abandoned, exchanged or otherwise disposed of the property. Finding intermeshing services on the "Big Elm School" site, the PSC considered

the site to be "gray and overlapping," that is not clearly part of either utilities' exclusive service area with intermeshed service. Finding *HREA 1938's* map of little value for determining if the school site was within an exclusive franchised area, the PSC used the customer's preference for MPC to determine which utility would service the area.

### B. *Auburn Woods Subdivision*

Auburn Woods Subdivision is a new subdivision located on a hill between Route 77/3, which is primarily served by MPC, and Beard's Run Road, which is primarily served by HREA. The subdivision, whose access is from Beard's Run Road, is located on a 57-acre tract, which has about 41 lots delineated and the possibility of about 100 houses. The subdivision's developer requested service from MPC.

The ALJ found that HREA had provided service from Beard's Run Road to two sites on the tract, one of which was a mobile house that had been located near the subdivision's entrance. The ALJ noted that HREA's distribution line was within 200 feet of the first house constructed in the subdivision, and that MPC's line was 3200 feet from the first house with access made by crossing Rt. 77/3, another's land and then ascending an 800-foot steep hill. The ALJ considered that MPC provides free a one span (500-foot) extension and that the prospective customer pays for any additional extensions. Finally the ALJ noted that in the opinion of the PSC staff, the subdivision's first two houses were within HREA's exclusive territory. Based on *HREA 1938's* map, the ALJ concluded that the entire subdivision was within HREA's exclusive territory.

However, instead of using the subdivision's first two houses to determine the subdivision's utility, the PSC considered the entire subdivision.[4] Specifically, the PSC noted that 100 houses are planned and that both utilities served properties adjacent to the subdivision. The PSC also noted that al-

**3.** The PSC notes that on May 24, 1993, HERA and MPC jointly filed a petition with the PSC to "more clearly define" the parties respective service territories allegedly because of the deficiencies of *HREA 1938's* map.

**4.** The PSC notes that its staff recommended that the subdivision be divided into two parts giving approximately half to each utility.

though prior to 1988 HREA served a mobile house whose location was at the edge of the subdivision's tract, the subdivision's plan calls for the mobile house's site to be a common green area without a house.[5] The PSC also noted that although HREA's lines were 290 feet from the house closest to HREA's lines, on the far side of the subdivision, MPC's lines were 820 feet from the planned house closest to MPC's lines. Approximately 2,400 feet separate the house closest to HREA's lines and the planned house closest to MPC's lines. The PSC also noted that most of the subdivision's lots (the 41 lots already subdivided and surveyed) are shaped to lie closer to MPC's facilities. Because different subdivision sections are closer to different utilities, the PSC, considering the subdivision as a whole, found that the subdivision was "gray and overlapping" and, based on the customer's preference, allowed service from MPC.

## II

■ Recently in *Sexton v. Public Service Commission*, 188 W.Va. 305, 423 S.E.2d 914 (1992) (approving a certificate of sewage treatment facility, on property owner's land), we restated our general standard for review of a PSC order. In Syl. Pt. 1, *Sexton, id.*, we said:

" '[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957). Syllabus Point 5, in part, *Boggs v. Public Service Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970)." Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W.Va. 387, 376 S.E.2d 593 (1988).

*In accord* Syl. Pt. *Braxton County Citizens v. Public Service Commission*, 189 W.Va. 249, 429 S.E.2d 899 (1993) (per curiam). In Syl. Pt. 1, *Chesapeake and Potomac Telephone Co. of West Virginia v. Public Service*

*Commission of West Virginia*, 171 W.Va. 494, 300 S.E.2d 607 (1982) (a rate case), we stated:

"In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Syllabus Point 2, *Monongahela Power Co. v. Public Service Commission*, [166] W.Va. [423], 276 S.E.2d 179 (1981).

*See Braxton, supra*, 189 W.Va. at 251–52, 429 S.E.2d at 901–2.

The three-pronged analysis established in *Monongahela Power, supra*, focuses on "(1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper. (Citation omitted.)" *Chesapeake, supra* 171 W.Va. at 498, 300 S.E.2d at 611.

## A.

On appeal, HREA argues that the PSC failed to give proper consideration to the ALJ's decision. HREA alleges that the PSC's review of an ALJ's decision should be similar to a circuit court's review of an agen-

---

5. The PSC also noted that although the ALJ found HREA had served another customer on the subdivision tract, the "record is clear that the separate structure was on adjacent property and not on the tract at issue."

cy's decision under the West Virginia Administrative Procedures Act, *W.Va.Code* 29A–5–4(g) [1964].[6] Specifically HREA maintains that because the ALJ is the PSC's trier of facts, his decision should be reversed only in certain limited circumstances, which circumstances according to HREA are not applicable in this case. The PSC argues that under *W.Va.Code* 24–1–9 [1979] the Commission retains the ultimate authority to render final orders and to set policies.

In *W.Va.Code* 24–1–1(a) [1986], the Legislature "confer[ed] upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities...." In order to fulfill its regulatory function, the PSC may under *W.Va.Code* 24–1–4 [1979] designate other employees to conduct hearings. *W.Va.Code* 24–1–4 [1979] states, in pertinent part:

> The commission *may* designate such of its employees as it deems necessary to hold hearings, held or required by this chapter, and to take evidence at such hearings, which employees are hereby empowered to subpoena witnesses, administer oaths, take testimony, require the production of documentary evidence and exercise such other powers and perform such other duties as may be delegated to them and required by the commission, in any proceeding or examination instituted or conducted by the commission under this chapter, at any designated place of hearing within the state. (Emphasis added.)

Although the PSC may designate employees to conduct hearings, the ultimate authority to render decisions remains with the PSC. *W.Va.Code* 24–1–9 [1979] states, in pertinent part:

> (d) In all proceedings in which exceptions have been filed to a recommended order, the commission, before issuing its final order, may afford the parties an opportunity for oral argument. When exceptions are filed, as herein provided, it shall be the duty of the commission to consider the same and if sufficient reason appears therefor, to grant such review or make such order or hold or authorize such further hearing or proceeding as may be necessary or proper to carry out the purposes of this chapter. The commission, after review, upon the whole record, or as supplemented by a further hearing, shall decide the matter in controversy and make appropriate order thereon.
>
> (e) When no exceptions are filed within the time specified, such recommended order shall become the order of the commission five days following the expiration of the period for filing exceptions unless the order is stayed or postponed by the commission: Provided, That the commission may, on its own motion before such order becomes the order of the commission, review any such matter and take action thereon as if exceptions thereto had been filed.[7]

---

**6.** *See* Syl. Pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of W.Va. Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983).

**7.** The following is the complete text of *W.Va.Code* 24–1–9 [1979]:

> (a) Any order recommended by a single hearing commissioner, a hearing examiner or a panel consisting of a hearing examiner and a single commissioner with respect to any matter referred for hearing shall be in writing and shall set forth separately findings of fact and conclusions of law, which findings of fact shall make specific reference to the evidence in the record which supports such findings, and shall be filed with the commission. A copy of such recommended order shall be served upon the parties who have appeared in the proceeding.
>
> (b) Before any order is recommended, the parties shall be afforded an opportunity to submit, within the time prescribed by the hearing commissioner, hearing examiner or panel proposed findings of fact and conclusions of law and briefs.
>
> (c) Within the time prescribed, the parties shall be afforded an opportunity to file exceptions to the recommended order and a brief in support thereof, provided the time so fixed shall be not less than fifteen days from the date of mailing by certified mail of such recommended order to the parties.
>
> (d) In all proceedings in which exceptions have been filed to a recommended order, the commission, before issuing its final order, may afford the parties an opportunity for oral argument. When exceptions are filed, as herein provided, it shall be the duty of the commission to consider the same and if sufficient reason appears therefor, to grant such review or make such order or hold or authorize such further hearing or proceeding as may be neces-

An ALJ's decision is a recommendation to the PSC, which "may, on its own motion ..., review any such matter and take action thereon...." *W.Va.Code* 24–1–9 [1979].

▪ Given the statutory language, we find that the PSC's authority to review internal decisions of its employees is not similar to the review procedures outlined in *W.Va.Code* 29A–5–4(g) [1964]. We therefore decline to limit the jurisdiction conferred by legislature on the PSC.

### B

HREA argues that the PSC erred in refusing to apply its decision in *HREA 1938* as shown by *HREA 1938*'s map, which, according to HREA, has provided for the parties' territorial integrity and orderly expansion for over 50 years. However, *HREA 1938* is not a blueprint for all future utility service; rather, it approves an agreement between the parties concerning their service territories in 1938. In order to resolve future competition, the parties in *HREA 1938* agreed to refrain from constructing distribution lines where the other had lines and before making any significant extensions (2,000 feet or more), to obtain the other's approval or the PSC's approval. *HREA 1938*'s map shows in 1938 the parties' existing and proposed distribution lines in Harrison County. On *HREA 1938*'s map, these distribution lines appear to cross, overlap, or run parallel, but they are not closed and do not form distinct boundaries. Although HREA maintains that the map is clear and that the PSC failed to take the time to understand it, the map, which

lacks a scale, geographical features and identifies a limited number of towns and cities, lacks the detail necessary to provide guidance in these disputes.

HREA's argument that *HREA 1938*'s map has guided the parties growth for 50 years is not supported by the evidence. The PSC, which referred to *HREA 1938* in three cases (one in 1940 and two in 1941), also approved of several cases (1971, 1972 and 1977) that used the same criteria as *HREA 1938* for the sale and/or transfer of property between the parties.[8] Indeed, Michael Cross, HREA's manager, acknowledged that only after the complaints were filed, did he discover and physically remove *HREA 1938*'s map from PSC's files in the summer of 1992. Other than Mr. Cross's location of the present disputes on *HREA 1938*'s map during his testimony, the map is not updated.

▪ In Syl. Pt. 2, *Chesapeake, supra,* we stated, "[t]his Court will not substitute our judgment for that of the Public Service Commission on controverted evidence." Based on our examination of *HREA 1938*'s map, we agree with the PSC that the key to resolving the present disputes is the utilities' facilities as they exist now and not an antiquated map.

### C

▪ Finally HREA argues that the PSC's decision is not supported by the evidence. The PSC acknowledges that its decision is

---

sary or proper to carry out the purposes of this chapter. The commission, after review, upon the whole record, or as supplemented by a further hearing, shall decide the matter in controversy and make appropriate order thereon.

(e) When no exceptions are filed within the time specified, such recommended order shall become the order of the commission five days following the expiration of the period for filing exceptions unless the order is stayed or postponed by the commission: Provided, That the commission may, on its own motion before such order becomes the order of the commission, review any such matter and take action thereon as if exceptions thereto had been filed.

(f) The commission, a hearing commissioner, a hearing examiner or panel to whom a matter is referred may expedite the hearing and decision of any case if the public interest

so requires by the use of pre-trial conferences, stipulations and agreements, prepared testimony, depositions, daily transcripts of evidence, trial briefs and oral argument in lieu of briefs, as appropriate.

8. HREA maintains that the PSC used *HREA 1938*'s map to determine that HREA should provide service to the AAA site—a part of the decision that was not appeal to this Court. *See* note 1. However, the PSC's AAA decision is not based on *HREA 1938*'s map, but on findings that HREA's facilities were on the AAA site, that HREA had a history of customer service to the AAA property and that MPC's facilities, although in the general area, were some distance from the site and would require a 179 foot extension.

not based on the ALJ's findings of fact, but rather on its own examination of the record.

In Syl. Pt. 3, *Chesapeake, supra,* we said:

Findings of fact made by the Public Service Commission will be overturned as clearly wrong when there is no substantial evidence to support them.

*See Mountain Trucking Co. v. Public Service Commission,* 158 W.Va. 958, 216 S.E.2d 566 (1975); *Mountain Trucking Co. v. Daniels,* 156 W.Va. 855, 197 S.E.2d 819 (1973). As we explained in *Chesapeake,* "[t]his does not mean that this Court will not make a searching and careful inquiry into the facts, but only that we will not substitute our judgment for that of the Commission. (Citation omitted.)" *Chesapeake, supra* 171 W.Va. at 488, 300 S.E.2d at 611.

■ Applying this standard, we conclude that the PSC had substantial evidence to conclude that both the "Big Elm School" and the "Auburn Woods Subdivision" were not within HREA's exclusive territory. The record shows that HREA was providing service to an oil well on the "Big Elm School" site for about two years and the MPC had provided service to the site since before 1953. Both utilities had facilities on the "Big Elm School" site; HREA's facilities were shown by its current service and MPC's facilities included two poles that had been on the site for more than 40 years. The PSC's finding that the "Big Elm School" site had an intermeshing of services is consistent with the evidence.

In the case of the "Auburn Woods Subdivision," the record shows that both utilities provided service to adjacent properties and that before its removal, HREA had provided service to a mobile house on the subdivision site. The PSC notes that HREA is closer to the houses planned near the subdivision's entrance and that MPC is closer to the houses planned at the back of the subdivision. The PSC also found that most of the planned houses are closer to MPC facilities and that no house, and therefore no service, is antici-

pated to be built on the mobile house's former location. The PSC's decision to treat the subdivision as a whole rather than have the utilities duplicate and crisscross facilities is supported by the record.

■ The PSC's tie-breaking mechanism to avoid duplication of service is to follow the customer's preference. This policy, first stated in the PSC case of *Lumberport–Shinnston, supra,* has been consistently applied by the PSC.[9] The PSC maintains that the *Lumberport–Shinnston* standard is a reasonable and fair way to resolve territorial disputes between utilities with overlapping services. In Syl. Pt. 1, in part, *Chesapeake,* we noted that "[our] responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." In these cases, we find that the PSC has balanced the competing interests and has given reasoned consideration to the pertinent factors.

For the above stated reasons, the order of the Public Service Commission issued on March 12, 1993 is affirmed.

Affirmed.

---

9. MPC argues that if *HREA 1938*'s map is found to be the pole star for determining electrical service in Harrison County, the PSC might be required to reconsidered the "FBI cases," namely, *Harrison Rural Electrification Association, Inc. v. Monongahela Power Co.* No. 90–621–E–C

(W.Va. P.S.C., Filed July 1, 1991), *appeal denied,* (W.Va., September 25, 1991); *Harrison Rural Electrification Association, Inc. v. Monongahela Power Co.* No. 91–806–E–C (W.Va. P.S.C., Filed March 9, 1992), *appeal denied,* (W.Va., June 3, 1992).