356 S.E.2d 470

**TAXI SERVICE, INC., d/b/a Yellow Cab, et al.,**

v.

**The PUBLIC SERVICE COMMISSION OF W. VA., and Brown's Limousine Crew Car, Inc., etc.**

**No. 17321.**

Supreme Court of Appeals of West Virginia.

April 13, 1987.

---

Thomas N. Hanna, Charleston, Jerry J. Cameron, Bluefield, Mark E. Kauffelt, Charleston, Gordon Billheimer, Montgomery, Larry L. Rowe, Homer W. Hanna, Jr., Charleston, for appellants.

Raymond Keener, III, Legal Div., Public Service Com'n, for appellees.

MILLER, Justice:

A number of taxi companies appeal a ruling of the Public Service Commission (PSC) which awarded Brown's Limousine Crew Car, Inc. (Brown's Limousine) a permit to transport railroad personnel in fif-

teen counties.[1] The taxi companies argue that the PSC erred in its decision because the decision was contrary to the law and the evidence. A second error is that the PSC failed to make sufficient findings of fact. After a careful examination of the evidence presented below, we agree, and therefore reverse the decision of the PSC.

On April 1, 1985, Brown's Limousine, a corporation headquartered in Fort Worth, Texas, filed an application with the PSC for a permit. It wished to operate ten motor vehicles as a contract carrier with the Chesapeake and Ohio Railway Company (C & O Railroad) in the transportation of railroad personnel within and between points and places in Boone, Cabell, Fayette, Greenbrier, Kanawha, Lincoln, Logan, Mingo, Nicholas, Pocahontas, Putnam, Raleigh, Summers, Wayne, and Wyoming Counties. At the protest hearings held before a hearing examiner of the PSC, the following evidence was developed.

Michael D. Wilkins, the president of Brown's Limousine, testified that his company had been engaged in the transportation of railroad, train, and airline crews for about eleven years. About 85 percent of their business involved transporting railroad crews. Brown's Limousine was authorized to do business in the State of West Virginia and was operating in twenty states throughout the United States. Brown's Limousine had entered into a contract with C & O Railroad, conditioned on receiving authority to operate from the PSC, to transport railroad and train crews in the West Virginia Division of the C & O Railroad.

Mr. Wilkins testified that all of his vehicles were in the three latest model years and were equipped with all of the latest in safety equipment. A number of the vehicles were equipped with two-way radio communication which would allow the driver to communicate directly with the railroad and the trains. Mr. Wilkins believed that the two-way radio communication would provide an advantage because it would allow the van driver to ascertain the location of the train. All of Brown's Limousine's drivers had been qualified by the federal Department of Transportation.

He also testified that the twelve-passenger vans which his company utilized were more advantageous in comparison to a regular-sized automobile commonly used in transporting train crews. They offered more comfort and room for the crew. He stated that because his service was specialized the railroad would save money not only from the rate basis charged, but also from improvement in crew utilization. It was Mr. Wilkins' view that the present taxi companies providing service to C & O Railroad were inefficient and utilized vehicles that were not properly maintained and were subject to mechanical breakdowns.

Grover A. Fitch, Trainmaster for the Logan District at Peach Creek, West Virginia, testifying on behalf of Brown's Limousine, stated that the normal size of a train crew is five men. The usual procedure used by a cab in locating a train is for the conductor of a crew to talk to the dispatcher and find out where the train was located and then go on a hunt-and-seek mission. Mr. Fitch testified that his area is served by Yellow Cab of Logan and that he had received numerous complaints about the cabs not being clean. Another complaint was the small size of the cabs and that a five-man crew could not get in one of the cabs safely and comfortably. Complaints were also received that the cabs were not punctual in arriving to pick up a crew which would result in undue delays and increased costs. He testified that a twelve-passenger van with two-way communication offered by Brown's Limousine would allow the van to haul more than one crew and to be in constant communication with the trains.

Moses Pack, Assistant Superintendent of Division Administration of C & O Railroad, also testified on behalf of Brown's Limousine stating that C & O Railroad had done a study which estimated an annual savings in the West Virginia Division of about $400,-

---

1. The various taxi companies are: Marsico Taxi, Inc.; Danville Taxi; Madison Taxi; Taxi Service, Inc.; Yellow Cab; Kanawha Valley Cab . Paratransit, Inc.; C and H Taxi; Nelson's Taxi, Inc.; Glen Morgan Cab Company; and Leeber Transportation, Inc.

000 in wage costs if Brown's Limousine's services were utilized. These estimated savings were based on Brown's Limousine's two-way radios enabling it to locate a train in a more timely manner and its twelve-passenger vans enabling it to transport two crews at peak times. Mr. Pack was of the view that service comparable to Brown's Limousine's was not presently being offered to C & O Railroad by the present taxi companies. It was his understanding that Brown's Limousine would locate one van each in Huntington, Logan, Chapmanville, St. Albans, Handley, Hinton, and Charleston, and two vans in Danville.

A number of owners of taxi companies gave opposing testimony. Mary Marsico of Marsico Taxi, Inc., in Montgomery, testified her company has five vehicles, which include two nine-passenger and three five-passenger vehicles. Her company has served C & O Railroad for seven or eight years with the five vehicles. Ms. Marsico testified that the economic climate of her area in Montgomery is poor with a great deal of unemployment and that her company had hauled mostly elderly people and people who are sick. Her company's business with the C & O Railroad was economically important and her company would close if it lost C & O Railroad's business. There was not really a heavy demand for public transportation in the Montgomery area. She also stated that Marsico Taxi, Inc., has never received any complaints about its service from C & O Railroad nor has it had any difficulty in locating C & O Railroad's trains. It has never failed to answer a call.

Jerry Thompson testified on behalf of Danville Taxi, which has two five-passenger vehicles. Mr. Thompson had spoken with Mr. Pack of the C & O Railroad and had told him he could provide clean, efficient service with any type of vehicle cheaper than Brown's Limousine could provide. He stated he would also be willing to acquire any type of radio equipment that was required. The Railroad had declined this offer. Mr. Thompson believed he could provide better service than Brown's Limousine. He stated that his operation would suffer severe economic impact by

the granting of the proposed application to Brown's Limousine because his business depended on revenues from C & O Railroad.

John McCoy testified that he owns Madison Taxi and has eight vehicles. He stated that C & O Railroad constituted about 80 percent of his business and he would go out of business if the application were granted. He stated he has never had any complaints from C & O Railroad. He pointed out that the radio equipment in his vehicles is computerized, and he could push a button and talk to C & O Railroad. He concluded by reiterating that the C & O Railroad's business was what enabled him to serve other members of the public as a common carrier.

Robert Leeber, president of Leeber Transportation, Inc., testified that he operates a taxicab and limousine business in Beckley which hauls railroad crews for C & O Railroad. In 1984, C & O Railroad's business constituted 6 percent of his revenues while in 1985, C & O Railroad's business constituted 10 percent of total revenues. He has not received complaints from C & O Railroad about his business, but, instead, has received some compliments from C & O Railroad regarding timely service and the upgrading of his vehicles. He stated his radios could be upgraded to handle the C & O Railroad radio frequency, although in his area he knows where the trains are at all times. He also stated that if he no longer had the revenues from C & O Railroad, it would have an adverse impact upon his ability to operate as a common carrier.

Charles Tweel testified on behalf of Taxi Service, Inc., and Yellow Cab. Mr. Tweel has operated Yellow Cab in Huntington for thirty-seven years and has twenty-four cabs. He has twelve 1982 Checkers and twelve 1984 Chevrolet Impalas with air conditioning and radios that cover Cabell County. He operates with C & O Railroad on a per-call basis and bills the Railroad at the end of the month. In 1985, the five-month average of C & O Railroad's charges was about $1,900. He stated he has never received any complaints from C & O Rail-

road about his service, except that the crews might need a little more room in the vehicles. The Railroad makes the determination as to the number of taxis which would be sent to pick up a crew. He was also of the view that loss of the C & O Railroad's business would adversely affect his business as a common carrier.

Stephen Steed testified on behalf of Kanawha Valley Cab Paratransit, Inc. His company has sixteen cabs with a seating capacity of four or five passengers each and three 1980 Dodge Maxi Vans with a seating capacity of twelve passengers each. These vans are air conditioned and equipped with radios. His company is located in Charleston and has authority to serve points and places in Kanawha County and throughout the State. He has tried to make arrangements to provide services to C & O Railroad, but the decision by C & O Railroad on whether to use his services has been delayed by the application of Brown's Limousine. Mr. Steed testified that his company could provide the type of service that Brown's Limousine proposed to provide and that he could begin providing the service immediately. He testified that the protestant, C and H Taxi, has one or two vans that it was using, similar to the vans owned by his company.

2. The PSC's order after an initial page setting out a short procedural history proceeded to this summary disposal of the case:

"DISCUSSION

"We have carefully reviewed the record in this case. The record reveals that the Applicant has met its burdens under *West Virginia Code* Chapter 24A, Article 3. Not only has the Applicant sufficiently demonstrated that its proposed service is specialized and that it will provide economical, safe and efficient service, the Applicant has demonstrated that there is an affirmative need for the service and that its operations will not endanger the safety of the public or unduly increase the maintenance cost of the highways, directly or indirectly. The record also reveals that the Protestants did not present evidence to successfully rebut the showing made by the Applicant. Accordingly, we shall reverse the Hearing Examiner's Decision and grant the permit as amended on May 30, 1985, with its proposed rates and charges. The Applicant shall file with the Commission its tariff within ten (10) days of the date of this order reflecting its rates and charges.

"FINDINGS OF FACT

On December 13, 1985, the hearing examiner issued a decision and determined that the application filed by Brown's Limousine should be denied. Specifically, in a thirty-seven page opinion, the hearing examiner stated that Brown's Limousine had failed to demonstrate that the service provided by existing common carriers was inadequate to meet the needs of C & O Railroad, that it had failed to demonstrate that the service by common carriers serving the proposed service area would not be adversely affected by the granting of the permit, and that it had failed to demonstrate that the granting of the application would not endanger public safety.

■ On May 9, 1986, the PSC issued a four-page order reversing the hearing examiner's decision. The PSC found that Brown's Limousine had sufficiently demonstrated that its proposed service was specialized and that there is an affirmative need for the service, that its operations would not endanger the safety of the public or unduly increase the maintenance cost of the highways, and that the rates and charges proposed were reasonable. Significantly, no mention was made in the PSC's order [2] as to whether Brown's Limousine's

"1. The Applicant has sufficiently demonstrated that its proposed service is specialized and that it will provide economical, safe and efficient service.

"2. The Applicant has demonstrated that there is an affirmative need for its service and that its operations will not endanger the safety of the public or unduly increase the maintenance cost of the highways, directly or indirectly.

"3. The rates and charges proposed by the Applicant for providing its service are reasonable.

"CONCLUSIONS OF LAW

"Since the Applicant met its burden under *West Virginia Code* Chapter 24A, Article 3, and since the Protestants did not present evidence to successfully rebut the showing made by the Applicant, we shall reverse the Hearing Examiner's Decision of December 13, 1985, and shall grant the Application as amended on May 30, 1985."

*See also* Syllabus Point 3, *Citizens Bank v. West Virginia Bd. of Banking and Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977).

We find this order to be totally inadequate under Syllabus Point 3 of *Mountain Trucking*

proposed service would under W.Va.Code, 24A–3–3(a), "impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory." [3]

We have traditionally recognized the statutory distinction between a common carrier which is regulated by W.Va.Code, 24A–2–1 *et seq.,*[4] and a contract carrier which is regulated by W.Va.Code, 24A–3–1, *et seq.* One of the most significant differences is the elements of proof that need to be shown to obtain a permit.

■ A common carrier under W.Va. Code, 24A–2–5(a), need only show that the public convenience and necessity require the proposed service as we explained in Syllabus Point 2 of *Weirton Ice & Coal Supply Co. v. Public Service Comm'n,* 161 W.Va. 141, 240 S.E.2d 686 (1977):

"Under the provisions of *W.Va.Code,* 1931, 24A–2–5(a), as amended, the Public Service Commission, if it finds from the evidence adduced at a hearing that public convenience and necessity require the proposed service, may grant a certificate of convenience and necessity to an applicant to render such service." [5]

*Co. v. Public Service Comm'n,* 158 W.Va. 958, 216 S.E.2d 566 (1975): "Where an administrative agency is required to find facts or state reasons as a basis for its order, the order must contain findings of facts, rather than conclusory statements, so as to withstand judicial scrutiny." We do not overturn the case on this procedural point because of a more significant substantive error.

3. W.Va.Code, 24A–3–3(a), in part, requires this initial finding before a permit can be issued to a contract carrier:

"No permit shall be granted unless the applicant has established to the satisfaction of the commission that the privilege sought will not endanger the safety of the public or unduly interfere with the use of the highways or impair unduly the condition or unduly increase the maintenance cost of such highways, directly or indirectly, or impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory."

4. W.Va.Code, 24A–1–2(e) and –2(f), define common and contract motor carriers:

■ A contract carrier on the other hand has more elements to prove under W.Va. Code, 24A–3–3,[6] in order to obtain a permit. Under this section, the primary focus is not on the public convenience and necessity, but on whether the contract carrier's activities will impair the efficient public service of any authorized common carrier, as we said in Syllabus Point 1 of *Mountain Trucking Co. v. Daniels,* 156 W.Va. 855, 197 S.E.2d 819 (1973) (Mountain Trucking I):

"An applicant for a permit to operate in this state as a contract carrier as provided in Code, 1931, 24A–3–3(a), as amended, must establish to the satisfaction of the Public Service Commission, *inter alia,* that the privilege sought will not impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory and this is especially applicable when a protest to the application is received by the commission from a common carrier serving the same territory."

*See also* Syllabus Point 1, *Mountain Trucking Co. v. Public Service Comm'n,* 158 W.Va. 958, 216 S.E.2d 566 (1975) (Mountain Trucking II).

"(e) [T]he term 'common carrier by motor vehicle' means any person who undertakes, whether directly or by lease or any other arrangement, to transport passengers or property, or any class or classes of property, for the general public over the highways of this state by motor vehicles for hire, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail, water or air and of express or forwarding agencies, and leased or rented motor vehicles, with or without drivers; (f) the term 'contract carrier by motor vehicle' means any person not included in subdivision (e) of this section, who under special and individual contracts or agreements, and whether directly or by lease or any other arrangement, transports passengers or property over the highways in this state by motor vehicles for hire."

5. We have recognized the statutory opportunity to correct deficiencies in service by a common carrier found in W.Va.Code, 24A–2–5(a). *See Weirton Ice & Coal Supply Co. v. Public Service Comm'n,* 161 W.Va. 141, 240 S.E.2d 686 (1977).

6. For the requisite elements of W.Va.Code, 24A–3–3, *see* note 3, *supra.*

There can be little question that under our statutory scheme a common carrier has imposed upon it broader duties to serve the public than a contract carrier. This is demonstrated by the increased regulatory powers of the PSC over common carriers under W.Va.Code, 24A–2–3 and –4, when contrasted with the PSC's powers over contract carriers under W.Va.Code, 24A–3–4 through –6.

It appears that because of this broader public regulation placed on common carriers, the legislature has imposed a countervailing obligation on a contract carrier seeking a permit to demonstrate that its more limited service would not "impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory." W.Va.Code, 24A–3–3.

The issue in both *Mountain Trucking* I and II was whether the contract carriers who sought to obtain a permit had established by sufficient proof the fact that their activities would not impair the public service of Mountain Trucking which was a common carrier. In each case, we concluded the contract carrier had not demonstrated that its service would not impair the service of the common carrier. In both cases, the common carrier presented some minimal evidence that its business might be harmed by the granting of a permit to the contract carrier.

Here, we have substantial testimony from the common carriers as to the adverse economic impact on their operations that would occur if Brown's Limousine were granted a contract carrier permit. No evidence was offered to rebut the common carriers' testimony.

■ The PSC argues that in considering whether to issue "a contract carrier permit, it must also consider the needs of the shipper with whom the carrier will contract for service." [7] We are not cited nor do we find any statutory basis for this factor. [8] Even if we were to assume interstitially that this could be a consideration, we do not believe that the needs of a shipper can override the statutory requirement under W.Va.Code, 24A–3–3(a), that a contract carrier show that no impairment of the efficient public service of a common carrier serving the same territory will occur if a permit is issued.

■ This case aptly illustrates the dangers of giving such a consideration any substantial weight. Many of the various taxi companies here involved are economically-dependent upon the C & O Railroad's business to enable them to perform their needed public service of transporting the elderly and the ill and those who lack a private vehicle. To permit a contract carrier to skim off this lucrative area of business may well sound the death knell to some of these taxi companies as their owners testified. Thus, a vital public service would be terminated in a number of the fifteen counties served by these taxi companies.

In view of the legislative requirement for a contract carrier permit, we conclude that the PSC was clearly wrong under the specific standard set forth in Syllabus Point 2 of *Mountain Trucking* II, *supra:*

"An order of the Public Service Commission granting authority to operate as a contract carrier will be reversed, as being clearly wrong, where the applicant for such authority fails to sustain the burden of proof required by *W.Va.Code* 1931, 24A–3–3, as amended."

**7.** For this proposition, the PSC cites *Sanitary Container Service, Inc.,* M.C. Case No. 16969 (October, 1978); *Roger Ball, dba Ball's Trucking & Backhoe Service, et al.,* M.C. Case No. 20876 (July 14, 1981).

**8.** It would appear that the PSC may be relying on cases under the former federal Motor Carrier Act, 49 U.S.C. § 301, *et seq.,* where among the factors to be considered in granting a permit to a contract carrier, "the Commission shall consider ... the effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements." 49 U.S.C. § 309(b). *See International Detective Service, Inc. v. I.C.C.,* 595 F.2d 862 (D.C.Cir.1979). This act was abolished in 1978, but much the same language has been recodified in 49 U.S.C. § 10923 (1978), and in its 1982 amendment. It also appears in some state statutes. Idaho Code § 61–802 (1963); Mo.Rev. Stat. § 390.051(5) (1969).

We would note that the PSC argues that a review of its order should be controlled by Syllabus Point 2 of *Monongahela Power Co. v. Public Service Comm'n,* 166 W.Va. 423, 276 S.E.2d 179 (1981).[9] However, this broader review is more applicable to the complexities of a rate case. *See Chesapeake and Potomac Telephone Co. of W.Va. v. Public Service Comm'n,* 171 W.Va. 494, 300 S.E.2d 607 (1982). Even under this standard, we determine that "the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority." Syllabus Point 1, in part, *Monongahela Power Co. v. Public Service Comm'n, supra.* This is because the PSC failed to consider Brown's Limousine's failure to prove that the common carriers involved would not be impaired in their services under W.Va.Code, 24A–3–3.

For the foregoing reasons, the order of the Public Service Commission is reversed.

Reversed.

---

**9.** Syllabus Point 2 of *Monongahela Power* states:
"In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors."