453 S.E.2d 619

COMMUNITY MOVING & STORAGE, INC.; Evans Transfer and Movers, Inc.; and Central Storage Company, Inc., Appellants,

v.

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Adkins Transfer, Inc., Appellees.

No. 22156.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 28, 1994.

Decided Dec. 14, 1994.

Charles D. Perfater, Perfater & Perfater, Charleston, for appellants.

Lisa L. Wansley, Charleston, for Public Service Com'n.

Thomas N. Hanna, Charleston, for Adkins Transfer, Inc.

PER CURIAM:

Community Moving & Storage, Inc., Evans Transfer and Movers, Inc., and Central Storage Company, Inc. (the common carriers) appeal an order of the West Virginia Public Service Commission (PSC) granting Adkins Transfer, Inc. a contract carrier permit to provide a delivery service for Montgomery Ward & Co. Alleging that as common carriers, they can perform the Montgomery Ward delivery service and that their efficient public service will be impaired if Adkins is permitted to operate the delivery service, the common carriers appeal to this Court. Because the record indicates that the PSC's decision was supported by substantial evidence, we affirm the final order of the PSC.

On November 30, 1992, Adkins, a Florida corporation, filed an application with the PSC for a contract carrier permit to transport merchandise between Montgomery Ward's retail stores in Harrison, Kanawha, Monongalia and Wood counties and to other points in West Virginia.[1] The common carriers, alleging they can provide the same service, protested the requested permit. After a hearing, the administrative law judge for the PSC recommended granting Adkins the contract carrier permit. The common carriers filed exceptions to the recommended decision. On November 9, 1993, the PSC entered its final order adopting the recommended decision to grant Adkins the contract carrier permit. Alleging that the PSC failed to consider the similar service provided by the common carriers and the adverse effect on the common carriers if the permit is granted, the common carriers appeal to this Court.

I

Beginning in October 1992, Montgomery Ward, a department store, entered into a nationwide contract with Adkins for the delivery of furniture and appliances. In West Virginia, four of Montgomery Ward's stores would be part of the switch to Adkins' deliv-

---

1. *W.Va.Code* 24A–1–2 [1991] provides the following pertinent definitions:

 (2) "Common carrier by motor vehicle" means any person who undertakes, whether directly or by lease or any other arrangement, to transport passengers or property, or any class or classes of property, for the general public over the highways of this state by motor vehicles for hire, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail, water or air and of express or forwarding agencies, and leased or rented motor vehicles, with or without drivers;

 (3) "Contract carrier by motor vehicle" means any person not included in subdivision (2) of this section, who under special and individual contracts or agreements, and whether directly or by lease or any other arrangement, transports passengers or property over the highways in this state by motor vehicles for hire. . . .

ery service.[2] In 1992, these four stores had over 10,000 deliveries. Although Montgomery Ward currently employs its own delivery personnel and uses its own trucks, under the Adkins contract, Adkins would employ and supervise the delivery personnel, who would wear Montgomery Ward uniforms, and would own and provide delivery trucks, most of which would carry the Montgomery Ward logo.

The service proposed by Adkins includes: (1) a telephone call setting up a delivery one day in advance; (2) a delivery appointment with a four-hour range; (3) trucks equipped with cellular telephones or, where necessary, beepers, to facilitate communications among the customers, the stores and delivery personnel; (4) installation of appliances that do not require any new plumbing or electrical work; and (5) the use of experienced, courteous, uniformed delivery personnel. Adkins proposes to tailor its delivery service to each store's requirements, to purchase existing Montgomery Ward equipment, and in most cases, to hire existing delivery personnel, provided they meet Adkins' requirements. At the hearing, Nathan Adkins, the Secretary–Treasurer of Adkins, said that he was developing an employee retirement and insurance program. Mr. Adkins also presented information about his company's accounting, billing and personnel reimbursement procedures. Under the contract Adkins would be paid $31.75 per delivery made. Mr. Adkins indicated that this new service could begin within three weeks.

According to Stephen Pater, Montgomery Ward's Home Delivery Manager, the store requires a dedicated delivery service because of their large volume, the need for experienced installers, the advantages in customer communications because of the pre-calls and use of cellular telephones, and the need to control the entire delivery process. Mr. Pater testified that the common carriers submitted a delivery proposal for the four West Virginia stores. According to Mr. Pater, the common carriers proposed to charge approximately $36 per hour for their service, even if the delivery were not made. Mr. Pater noted that, in the past, hourly rates were difficult to budget and resulted in tremendous budget overruns. In addition, the common carriers' trucks are not currently equipped with cellular telephones and the common carriers' proposal did not include a pre-call the evening before a delivery to the customer to assure correct and timely deliveries.

Leonard E. Papa, President of Community Moving and Storage and Central Storage, and General Manager of Evans Transfer, testified that together the common carriers have authority to transport goods intrastate in all the Montgomery Ward delivery areas, have offices in Shinnston, Nitro and Clarksburg, own 20 pieces of equipment and employ 35 persons. Mr. Papa noted that the common carriers have successfully delivered furniture and appliances for other department stores and currently provided a delivery service for three stores.[3] Mr. Papa noted that the charge of the common carriers' delivery proposal was based on the common carriers' tariff filed with the PSC and would be close to $36 per hour. However the quoted tariff rate could not be found in the approved tariff rates for the common carriers either for Northern or Southern West Virginia.

Mr. Papa explained that unlike a simple delivery service, the common carriers have the capability, training and experience necessary to move whatever the public requires including: pianos, delicate computers, massive equipment and entire households. Mr. Papa noted that the common carriers' employees have an attractive benefit and retirement package. According to Mr. Papa, although their trucks did not have cellular telephones, the common carriers recognized the benefits and were willing to use cellular telephones. Mr. Papa noted that the common carriers would need new, smaller equipment suitable for smaller short range home deliveries. Finally Mr. Papa said that the common carriers' drivers could wear appropriate uniforms and Montgomery Ward's logo could appear on a dedicated truck.

---

**2.** Montgomery Ward did not propose changing the delivery system of its Beckeley store.

**3.** One of the common carriers provided delivery service to Sears, Roebuck & Co. for about five years. The service ended in 1987 when Sears decided to operate its own delivery service.

Mr. Papa noted that the dedicated service currently provided by one of the common carriers costs $43.20 per hour and that between 250 to 300 monthly deliveries are made.[4] The store calls its customers to set up and to verify the delivery. Of all these deliveries, Mr. Papa recalled that in May 1992 only one person was not home and only one wrong lot was delivered.

Mr. Papa said he was willing to apply to the PSC for a per delivery tariff but did not indicate what the proposed flat tariff would be. Mr. Papa said that removing the Montgomery Ward delivery segment from the common carriers would be something his companies could never overcome because of the shrinking client base. Mr. Papa acknowledged that the common carriers would need additional personnel and would consider hiring Montgomery Ward's current delivery personnel. The common carriers would be ready to provide delivery service to Montgomery Ward within several weeks under their present tariff until a per delivery rate was approved by the PSC.

## II

Traditionally, we have recognized a statutory distinction between a common carrier, which is regulated by *W.Va.Code* 24A–2–1 [1937] *et seq.* and a contract carrier, which is regulated by *W.Va.Code* 24A–3–1 [1937] *et seq.* In *Taxi Service, Inc. v. Public Service Comm'n,* 177 W.Va. 716, 721, 356 S.E.2d 470, 475 (1987), we noted that "[o]ne of the most significant differences [between these carriers] is the elements of proof that need to be shown to obtain a permit." [5]

4. The common carriers' most important dedicated delivery service is for the Huntington Mall store of JC Penney Co., Inc., and it consists of two trucks for two days a week. This delivery service was acquired from Adkins in 1990 when Adkins relocated from Huntington to Florida.

5. In its supplemental brief, the PSC noted that on August 23, 1994, President Clinton signed the Federal Aviation Administration Authorization Act of 1994 (FAAA Act of 1994), P.L. 103–305 [H.R. 2739], 108 Stat. 1569–1607. According to the PSC, effective January 1, 1995, the FAAA Act of 1994 removes the PSC's intrastate economic regulatory jurisdiction over rates, territory and

Although to obtain a permit a common carrier needs only to show "that public convenience and necessity require the proposed service" (Syl. pt. 2, in part, *Weirton Ice & Coal Supply Co. v. Public Service Comm'n,* 161 W.Va. 141, 240 S.E.2d 686 (1977)), a contract carrier must show that its service will not impair the efficient public service of any authorized common carrier. *W.Va.Code* 24A–3–3(a) [1967] provides, in pertinent part:

No permit shall be granted unless the applicant has established to the satisfaction of the commission that the privilege sought will not endanger the safety of the public or unduly interfere with the use of the highways or impair unduly the condition or unduly increase the maintenance cost of such highways, directly or indirectly, or impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory.

■ In Syl. pt. 1, *Mountain Trucking Co. v. Daniels,* 156 W.Va. 855, 197 S.E.2d 819 (1973) (*Mountain Trucking I*), we stated:

An applicant for a permit to operate in this state as a contract carrier as provided in Code, 1931, 24A–3–3(a), as amended, must establish to the satisfaction of the Public Service Commission, *inter alia,* that the privilege sought will not impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory and this is especially applicable when a protest to the application is received by the commission from a common carrier serving the same territory.

service of nearly all motor carriers of property, except for transportation of household goods. *See* FAAA of 1994 §§ 601(h)(1) and (2), P.L. 103–305 § 601(h)(1) and (2), and 108 Stat. 1606. The PSC notes that "household goods," as defined by 49 U.S.C. § 10102(11), does not include the merchandise to be transported for Montgomery Ward.

The common carriers urge us not to consider this case to be moot because the effective date of the deregulatory provision may be stayed and a premature determination would unfairly deny them their right to appeal and procedural due process.

*In accord* Syl. pt. 1, *Taxi supra;* Syl. pt. 1, *Mountain Trucking Co. v. Public Service Comm'n,* 158 W.Va. 958, 216 S.E.2d 566 (1975) (*Mountain Trucking II* ).

In *Taxi,* we recognized that our statutory scheme imposes broad duties on a common carrier and balances that by requiring "a contract carrier seeking a permit to demonstrate that its more limited service would not 'impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory.' W.Va.Code, 24A–3–3." *Taxi,* 177 W.Va. at 722, 356 S.E.2d at 476.

The issue of potential impairment of a common carrier was addressed in *Taxi* and both *Mountain Trucking I* and *II.* In *Taxi,* various taxi companies presented evidence that they were "economically dependent upon the C & O Railroad's business [, which the contract carrier wanted to provide,] to enable them to perform their needed public service of transporting the elderly and the ill and those who lack a private vehicle." *Taxi,* 177 W.Va. at 722, 356 S.E.2d at 476. Several of the owners of the taxi companies testified that C & O Railroad's business made up more than half their business. *Taxi,* 177 W.Va. at 719–20, 356 S.E.2d at 473–74.

 In Syl. pt 2, *Taxi,* we held that "[t]he needs of a shipper cannot override the statutory requirement under W.Va.Code, 24A–3–3(a), that a contract carrier show that no impairment of the efficient public service of a common carrier serving the same territory will occur if a permit is issued." In this case, we find that although Adkins and Montgomery Ward presented evidence that the contract between them was designed to meet the shipper's needs, neither the administrative law judge nor the PSC allowed that consideration to override the need to show that the public service of the common carriers would not be impaired.

In *Mountain Trucking II,* the common carriers' assertion that their "companies would suffer by the grant of this requested permit" was not refuted. *Mountain Truck-*

*ing II,* 158 W.Va. at 962, 216 S.E.2d at 569. *Mountain Trucking II* also noted that the PSC "neglected its duty as a *fact-finder* in this case to *find facts.*" *Mountain Trucking II,* 158 W.Va. at 964, 216 S.E.2d at 569. In *Mountain Trucking I,* the common carriers noted their trucks were idle and "that the grant of the requested contract carrier permit would adversely affect their respective companies." *Mountain Trucking I,* 156 W.Va. at 859–60, 197 S.E.2d at 822.

In this present case, the common carriers' claimed that the contract carrier permit would hinder their operation by stating:

> Whenever there is a common carrier that can provide the service requested to change to a contract carrier, it eliminates a segment of business that should have the opportunity of a common carrier.

> We constantly add new customers, lose new customers for whatever purpose. They move out of town. In the scenario of Sears, they took the delivery service back in-house because they had change of management, idea of management.

> So take somebody like Montgomery Ward that has approximately 8,000 possible deliveries within West Virginia, to remove that segment of business from the possibility of our acquiring it, would be something that we could never recover from.

However, the common carriers said that they would need new employees and new trucks to deliver for Montgomery Ward. According to the common carriers, these new employees would not require the intensive level of training of their current employees and different sized and designed trucks are required for the Montgomery Ward service.[6]

In this case, the common carriers seek to expand their companies, not through their common carrier operations but by taking over a specialty service, designed by a different company. Although most of the service details of the Adkins contract are not now offered by the common carriers, the common carriers maintain that they are willing and able to provide such services. The common

---

**6.** The common carriers said that they currently had two trucks appropriate for the proposed service.

carriers also maintain that if Adkins' permit is refused, they will seek a contact carrier permit to provide the same service.

In its decision the PSC noted that "[t]he approval of the permit will in no way impair the common carriers' current business. They do not even currently have the necessary equipment. They do not even currently provide a service that is substantially the same as suggested by the contract carrier and Montgomery Ward. The mere fact that the protestants claim that they are willing to purchase additional trucks and equipment, hire additional personnel and change the nature of their services, does not preclude Commission approval of the contested permit."

 Our general standard for reviewing a PSC order was recently reaffirmed in Syl. pt. 1, *Sexton v. PSC*, 188 W.Va. 305, 423 S.E.2d 914 (1992), which states:

> " '[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957)." Syllabus Point 5, in part, *Boggs v. Public Service Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970). Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W.Va. 387, 376 S.E.2d 593 (1988).

In Syl. pt. 2, *Chesapeake and Potomac Telephone Co. of West Virginia v. Public Service Comm'n*, 171 W.Va. 494, 300 S.E.2d 607 (1982), we held that "[t]his Court will not substitute our judgment for that of the Public Service Commission on controverted evidence." However, in Syl. pt. 3, *Taxi*, we held:

> "An order of the Public Service Commission granting authority to operate as a contract carrier will be reversed, as being clearly wrong, where the applicant for such authority fails to sustain the burden of proof required by *W.Va.Code* 1931, 24A–3–3, as amended." Syllabus Point 2, *Mountain Trucking Co. v. Public Service*

*Comm'n*, 158 W.Va. 958, 216 S.E.2d 566 (1975).

Applying this standard to the present case, we conclude that the PSC did not err in finding that the issuance of a contract carrier permit to Adkins would not impair the efficient public service of the common carriers.

For the above stated reasons, the order of the Public Service Commission issued on November 9, 1993 is affirmed.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.